IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID ANDRADE, et al.                              :
                                                   :
        v.                                         :            CIVIL NO. CCB-08-2668
                                                   :
AEROTEK, INC.                                      :
                                          ...o0o...

**MEMORANDUM**

Defendant Aerotek, Inc. ("Aerotek") has moved for summary judgment on the claims of

plaintiff Janel Kleinpeter.  Ms. Kleinpeter, along with other plaintiffs not subject to this motion,

filed suit against Aerotek under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

Ms. Kleinpeter alleges that she was improperly classified as exempt when she worked as a

Recruiter and as an Account Recruiting Manager ("ARM") at Aerotek, and was therefore denied

overtime she was due.  The issues in this motion have been fully briefed and no oral argument is

necessary.  For the following reasons, the court will grant the defendant's motion.

**BACKGROUND**[1]

Aerotek is an international staffing company that provides technical, professional and

---

[1]     The following facts are described in the light most favorable to Ms. Kleinpeter, the non-
moving party.  There are instances, however, where Ms. Kleinpeter's declaration, which she
submitted in opposition to the defendant's motion, contradicts her prior sworn deposition
testimony.  A later sworn statement that contradicts an earlier deposition does not by itself create
a genuine issue of material fact.  *See Erwin v. United States*, 591 F.3d 313, 325 n. 7 (4th Cir.
2010).  It is well established that "a genuine issue of material fact is not created where the only
issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is
correct."  *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).  Rather, "[i]f a party who
has been examined at length on deposition could raise an issue of fact simply by submitting an
affidavit contradicting his own prior testimony, this would greatly diminish the utility of
summary judgment as a procedure for screening out sham issues of fact."  *Id.* (internal quotation
marks and citation omitted).  Accordingly, to the extent that statements in Ms. Kleinpeter's
declaration conflict with her earlier deposition testimony, the court will not rely on them as
creating a factual dispute.  *See Erwin*, 591 F.3d at 325 n. 7 (stating that reliance on later sworn
testimony as creating a factual dispute with earlier deposition testimony was "misplaced".)

industrial recruiting and staffing services.  The company is headquartered in Hanover, Maryland

and has approximately 150 offices in the United States.  It is divided into eight divisions, each of

which focuses on a particular industry or industries.  Aerotek employs thousands of recruiters to

find, screen and recommend candidates to its clients.

In March 2007, Ms. Kleinpeter began working at Aerotek's Charlotte, North Carolina

office as a Recruiter Trainee in the Professional Services Division, which serves the financial

services, healthcare, and insurance industries, among others.  She had one year of recruiting

experience before starting at Aerotek, and she was specifically hired to work on Aerotek's

Wachovia account.  Recruiter Trainees undergo a ninety-day training period, after which some of

them are promoted to Recruiter positions.  Trainees are paid by the hour and are classified as

non-exempt employees under the FLSA.  Ms. Kleinpeter excelled as a Recruiter Trainee, and

began recruiting on her own during her second week at Aerotek.  Accordingly, on June 4, 2007,

Ms. Kleinpeter was promoted to the position of Recruiter.  As a Recruiter she earned a salary of

$33,000, plus commission.  (Kleinpeter Dep. at 67: 3-5, Feb. 12, 2009.)  She remained in that

position until March 2008, at which point she was again promoted, this time to a Recruiter II

position.  While a Recruiter II, Ms. Kleinpeter performed the same duties as a Recruiter, but with

a larger salary of $38,000, plus commission.  (*Id*. at 305: 10-18.)  Aerotek classifies both

Recruiters and Recruiter IIs as exempt from the FLSA.

In April 2008, Ms. Kleinpeter received a third promotion and began working as an ARM.

At this point, her duties included work beyond recruiting, such as account management and

sales.  Although she did not officially become an ARM until April 2008, she had been doing

many ARM duties since as early as November 2007.  (*Id*. at 226: 2-4; 319: 8-13.)  ARMs are

also salaried and FLSA-exempt employees.  Ms. Kleinpeter left her employment at Aerotek in

May 2008 to pursue other opportunities.

A.      *Recruiter Duties*[2]

As a Recruiter, Ms. Kleinpeter's primary duty was to find and place financial services professionals in contract positions at Aerotek's financial services clients, typically for six-month to one-year durations.[3]  To accomplish this, Ms. Kleinpeter would source, screen and interview possible contractors.  She used a variety of tools to initially identify potential contractors, such as job boards, Monster.com, Career Builder.com, and Aerotek's internal "Team Track" database. (*Id*. at 172: 11-17.)  She also kept her own personal "pipeline" of contractors, first on a sheet of paper, and later in an excel spreadsheet.  (*Id*. at 167: 4-11; 178: 11 – 179: 13.)  She usually made between fifty and one hundred calls per day.  (*Id*. at 168: 6-8)  After an initial phone call, she would have an in-person screening interview in order to assess a candidate's personality.  (*Id*. at 183: 14 – 184: 1.)  Because Ms. Kleinpeter also met with managers at the client company, she would then determine whether the candidate would be a good personality fit.  (*Id*. at 181: 1-7; 185: 7-14.)  Additionally, she would ask for three professional references from each potential contractor.  She would call the references to verify employment and work performance, and to ask any questions that were remaining after the screening interview.  (*Id*. at 238: 12-17.)

Ms. Kleinpeter did not make the ultimate decision as to which candidates were presented to the client's hiring manager, however.  Rather, she would send the resumes of contractors she believed to be the most qualified to one of the Account Managers on the Wachovia account, Chris Parise or Todd Brannon, who was overseeing the position.  She would also type up a

---

[2]      The court will combine its analysis of Ms. Kleinpeter's work as a Recruiter and as a Recruiter II because, apart from salary, the positions were the same.

[3]      Although Ms. Kleinpeter's work focused primarily on the financial services industry, she also worked to fill jobs requisitions for positions in the commercial, scientific and environmental divisions of Aerotek.

"submission statement" describing the candidate, and send it to the Account Manager along with each resume. (*Id*. at 193: 4-9.) Sometimes she would present to her Account Manager a candidate who lacked some of the qualifications for the position, but whom she thought would nevertheless be a good fit. (*Id*. at 202: 5-9.) She would also "advocate" to her Account Manager on behalf of a contractor that she had a "gut feeling about", even one with less experience than others. (*Id*. at 247: 3-22.) Roughly seventy-five percent of the candidates that Ms. Kleinpeter presented to her Account Manager would be forwarded to the client's hiring manager. (*Id*. at 194: 19 – 195: 7.) On a couple of occasions, at Mr. Brannon's request, Ms. Kleinpeter sent resumes directly to the client hiring manager, but she did so from his email account "because he did not want [her] sending those resumes through [her] E-mail." (*Id*. at 187: 17-20.) Ms. Kleinpeter testified that Mr. Parise rarely had any questions about the candidates she sent him because "he didn't have a whole lot of experience selling into financial services and so I was kind of helping him along." (*Id*. at 194: 14-18.) Mr. Brannon would only have "a couple more questions here and there". (*Id*. at 194: 19-22.)

Ms. Kleinpeter would negotiate certain matters with candidates before their resumes were sent to the client company. For instance, she would negotiate pay. (*Id*. at 204: 12-14.) She explained in her deposition that there was a "wide variety of ways you can go about [negotiating pay]". (*Id*. at 205: 12-15.) Her Account Manager might indicate a margin of profit that Aerotek intended to make on a particular position, and this would provide Ms. Kleinpeter with a range of pay that she could offer. (*Id*. at 205: 20 – 206: 6.) Within that range, Ms. Kleinpeter had the ability to decide what amount to offer a candidate. (*Id*. at 206: 22 – 207: 4.) She also had the ability to negotiate vacation and holiday pay. Ms. Kleinpeter testified that "[t]hose were up to the discretion of the recruiter." (*Id*. at 207: 17-19.) She added that "[i]f [a recruiter] felt like that

was going to make or break a deal, you were allowed to offer it to them." (*Id*. at 207: 19-21.)
On some occasions, Ms. Kleinpeter also recommended to her Account Manager that the client
lower its expectations for the type of candidate it was going to find based on the pay being
offered. (*Id*. at 203: 9-19.) Sometimes, she would recommend that either expectations be
lowered or rates be increased. (*Id*. at 204: 4-7.) Her Account Manager would then deal with the
client's expectations. (*Id*. at 204: 8-11.)

     Ms. Kleinpeter prepared all candidates for their interviews with the client company.
Once a candidate was hired, it was Ms. Kleinpeter's job to also "manage contract employees
while on assignment" and to "[a]ssess and investigate contractor related problems, and
administer performance counseling, coaching and disciplinary measures when necessary." (*Id*. at
242: 17 – 243: 7; *see also* Def.'s Summ. J. Mem. at Ex. B5, Aerotek Recruiter Job Description.)
Ms. Kleinpeter testified that she took contractors who had been hired by the client out to lunch,
coffee or dinner "at least once a month." (*Id*. at 253: 6-9.) The contractors would contact her
with problems and would report how things were going in their new positions. (*Id*. at 253: 19 –
254: 2.) Clients, however, would typically report contractor problems to the Account Managers.
(*Id*. at 254: 3-6.) On at least one occasion, however, Ms. Kleinpeter was asked by a client hiring
manager to discipline a contractor by having a conversation about a problem at work. (*Id*. at
258: 16 – 259: 4.) She never personally had to terminate anyone, but recalled that other
Recruiters had to terminate contractors. (*Id*. at 259: 5-8.) Such decisions were made by the
clients and not the Recruiters themselves. (*Id*. at 260: 13 – 261: 9.)

     It was also part of Ms. Kleinpeter's job as a Recruiter to "maintain relationships with
industry contacts to provide customer service, gain industry knowledge, and get referrals and
sales leads." (*Id*. at 244: 13-21; *see also* Def.'s Summ. J. Mem. at Ex. B5.) As part of this duty,

she had business meetings with managers at the client company.  (Kleinpeter Dep. at 181: 5-14.)
As a Recruiter, Ms. Kleinpeter even brought in a new account to Aerotek.  (*Id*. at 274: 11 – 275:
9.)

B.      *ARM Duties*

By November 2007, Ms. Kleinpeter was regularly taking on the duties of the ARM for
the Wachovia account as well, and by January 2008, she was "full force doing sales and
recruiting." (*Id*. at 319: 10-13.)  Her compensation of $38,000 base salary plus commission
remained the same, however.  (*Id*. at 320: 3-16.)  Ms. Kleinpeter testified that "[a]n ARM role is
a hybrid of recruiting." (*Id*. at 320: 20.)  In this position, she did fifty percent sales and fifty
percent recruiting.  According to Ms. Kleinpeter, as part of the sales team, she helped sell and
"generate leads, more client development." (*Id*. at 370: 3-7.)  She was required to have five to
seven face-to-face meetings with the client per week at which she would build relationships and
discuss "potential opportunities that they foresaw coming down." (*Id*. at 370: 15-22.)  Hiring
managers also began to contact her directly in this position because she "was responsible for reqs
coming out." (*Id*. at 196: 12-15.)  In fact, she was personally responsible for generating business
for Aerotek in Wachovia's risk management, operations, and back office operations lines of
business.  (*Id*. at 321: 1-8.)

Her recruiting responsibilities remained the same, although she also began mentoring
junior recruiters once she became an ARM.  (*Id*. at 371: 16-20; 372: 13-14.)  She had two
mentees, and testified that mentoring took up twenty-five percent of her time.  (*Id*. at 374: 5-12.)
She would help her mentees find contractors and put together search strings, coach them on their
phone conversation skills, and help them resolve conflicts in the office.  (*Id*. at 372: 1-11.)  Ms.
Kleinpeter testified that she considered herself to be management as an ARM.  (*Id*. at 369: 12-

17.)  Being part of management, she testified, meant that "you were a leader in the office, at
Aerotek it meant that you had some significant seniority over everybody else."  (*Id*. at 369: 18-
22.)

Ms. Kleinpeter left Aerotek in May 2008.  Along with several other former Aerotek
recruiters, she filed suit in the Southern District of New York on July 24, 2008, on behalf of
herself and those similarly situated.  The case was subsequently transferred to this District.  In a
previous ruling, 2009 WL 2757099 (D. Md. Aug. 26, 2009), this court conditionally certified a
class as to some of Aerotek's Recruiter Trainees.  Aerotek has moved for summary judgment on
Ms. Kleinpeter's claims.  Aerotek argues that as a Recruiter and as an ARM Ms. Kleinpeter was
subject to the administrative exemption from the requirement that employees be paid over-time
for work beyond forty hours per week.  For the reasons explained below, the court agrees.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment
"should be rendered if the pleadings, the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court has clarified
that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this
standard provides that the mere existence of *some* alleged factual dispute between the parties will
not defeat an otherwise properly supported motion for summary judgment; the requirement is
that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest
upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Pursuant to the FLSA, employees must be paid time and a half for work over forty hours per week. 29 U.S.C. § 207(a)(1). Certain employees are exempt from this requirement, however, including those persons "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). An employer bears the burden of proving, by clear and convincing evidence, that an employee's job is exempted. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 691 (4th Cir. 2009). Policy dictates that FLSA exemptions be narrowly construed against the employer, and their application should be "limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit." *Id.* at 692 (internal quotation marks and citation omitted, and alteration in original).

Aerotek argues that Ms. Kleinpeter was employed in an administrative capacity. Regulations adopted by the Department of Labor ("DOL") pursuant to statute set forth a three-part test to determine whether an employee falls under the administrative exemption.[4] Subject to

---

[4]     The regulations promulgated by the DOL pursuant to an express delegation of legislative authority must be "given controlling weight unless found to be arbitrary, capricious, or contrary to the statute." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 8 (1st Cir. 1997) (citing *Chevron*

the exemption is any employee: (1) who is compensated on a salary or fee basis of at least $455

per week; (2) "[w]hose primary duty[5] is the performance of office or non-manual work directly

related to the management or general business operations of the employer or the employer's

customers;" and (3) "[w]hose primary duty includes the exercise of discretion and independent

judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).[6]  Salary alone is not

dispositive under the FLSA, but the Fourth Circuit has noted that the "FLSA was meant to

protect low paid rank and file employees", not higher-paid managerial employees.  *Darveau v.*

*Detecon, Inc.*, 515 F.3d 334, 338 (4th Cir. 2008) (internal quotation marks and citation omitted).

Other courts have found positions similar to Ms. Kleinpeter's exempt.  *See, e.g., Goff v. Bayada*

*Nurses, Inc.*, 424 F. Supp. 2d 816, 824 (E.D. Pa. 2006) (holding that a supervisor for a nursing

agency who placed nurses with patients and managed the nurses' relationships with customers fit

within the administrative exemption); *Hudkins v. Maxim Healthcare Servs.*, 39 F. Supp. 2d 1349,

1349-50 (M.D. Fla. 1998) (holding that a recruiter of nurses for defendant's client hospitals was

exempt); *see also Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1365-66 (11th Cir.

1997) (affirming jury's verdict that a sales recruiter fell within the administrative exemption).

The parties agree that Ms. Kleinpeter's salary was more than $455 per week as a

Recruiter and as an ARM.  Moreover, they do not dispute that Ms. Kleinpeter performed office

---

*U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984)).  Interpretive regulations issued by the DOL, however, "are not conclusive, as they merely set forth the Secretary's official position on how the regulations should be applied in specific contexts."  *Id*.  Nevertheless, interpretive regulations may still have the power to persuade.  *Id*.

[5]     Relying on previous DOL regulations, now amended, the Fourth Circuit explained in *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir. 1986), that "primary duty" means "the major part or over 50 percent of the employee's time." (internal quotation marks omitted).

[6]     The regulations were amended effective August 23, 2004 from a previous long and short test for exemption.  *See Desmond*, 564 F.3d at 691 n.2.

or non-manual work.  At issue, however, is whether her work in these positions was directly

related to the management or general business operations of Aerotek or its customers, and

whether Ms. Kleinpeter exercised discretion and independent judgment on matters of

significance.

A.        *Work Directly Related to Management or Business Operations*

The court finds that in both her capacities as a Recruiter and as an ARM, Ms.

Kleinpeter's work was directly related to the management or business operations of Aerotek's

customers.

The phrase "directly related to management or general business operations" refers to the

type of work performed by the employee.  *Desmond*, 564 F.3d at 693.  The DOL has interpreted

such work to include "work in functional areas such as . . . personnel management; human

resources; employee benefits; [and] labor relations".  29 C.F.R. § 541.201(b).  Furthermore,

DOL interpretive regulations state that employees may qualify for the administrative exemption

not only if they perform such duties for their employer, but also if they do so for their employer's

clients by "acting as advisers or consultants to their employer's clients or customers (as tax

experts or financial consultants, for example)".  29 C.F.R. § 541.201(c).

In a 2005 opinion letter, the DOL concluded that a staffing manager at a temporary

staffing agency "performed work in the functional areas of personnel management, human

resources and labor relations" by "recruiting, hiring and managing the temporary labor pool of

[the agency's] clients" and, therefore, met the requirement of performing "work directly related

to the management or general business operations of the employer's clients."  Dep't of Labor

Op. Ltr., 2005 WL 3308616 (Oct. 25, 2005); *see also* Dep't of Labor Op. Ltr., 2000 WL

34444341 (Dec. 8, 2000) (advising that university technical recruiters who screened, tested and

interviewed applicants for employment, and made personnel recommendations to hiring

managers, were engaged in work directly related to management policies or business operations

of their employer.)  Similarly, courts have found that employees in a recruiting or staffing

position perform work directly related to the management or business operations of their

employers or their employers' clients.  *See, e.g., Goff*, 424 F. Supp. 2d at 824 (holding that the

job of a supervisor at a provider of in-home nurses who "matched nurses to patients" and was

involved in "casemanaging to ensure that the employee retains a positive relationship with the

client" was directly related to the management or business operations of the employer or its

clients); *Hudkins*, 39 F. Supp. 2d at 1350 (holding that the primary duty of a recruiter at company

that placed nurses in hospitals "was directly related to the Defendant's general business

operation").

While working as a Recruiter and as an ARM at Aerotek, Ms. Kleinpeter found and

placed financial services professionals in contract positions at Aerotek's clients.  She interviewed

candidates, negotiated pay, including holiday and vacation pay, and helped manage the

contractors once they were hired.  Thus, it is clear that she was performing work in the functional

areas of personnel management and human resources for Aerotek's clients.  Such work is

squarely within the DOL's interpretation of "business operations".[7]  *See* 29 C.F.R. § 541.201(b).

---

[7]     The administrative/production dichotomy described in 29 C.F.R. § 541.201(a), and relied upon by Ms. Kleinpeter, supports, rather than alters, the court's analysis.  *See* § 541.201(a) ("an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.").  As a Recruiter, Ms. Kleinpeter provided an administrative human resources service to Aerotek's clients; she did not "produce" anything. Furthermore, as Aerotek points out, it is the services of the contractors that are the product of Aerotek's business, not the contractors themselves.  *See Hudkins*, 39 F. Supp. at 1350 (finding that in the context of a nurse-staffing agency, the *nurses* a recruiter placed with the clients *produced* the services offered by the business); *see also Webster v. Public Sch. Employees of Washington, Inc.*, 247 F. 3d 910, 916 (9th Cir. 2001) (holding that a labor union field

Furthermore, in addition to her recruiting duties, as an ARM, Ms. Kleinpeter communicated

directly with Aerotek's clients on a regular basis about their personnel needs, as she sought

further business from them.  *See Darveau*, 515 F.3d at 338-39 (holding that where an employee

played a significant role in projecting a company's "public face" by approaching current and

potential clients about their telecommunications needs and negotiating terms of sale, he fell

within the administrative exemption.)  Accordingly, the court finds that Ms. Kleinpeter's primary

duty as a Recruiter and as an ARM was directly related to the business operations of Aerotek's

clients, and meets the second element of the administrative exemption test.

B.       *Work Requiring Discretion and Independent Judgment*

Ms. Kleinpeter also exercised discretion and independent judgment on matters of

significance in her positions sufficient to place her within the FLSA's administrative exemption.

The DOL's interpretive regulations explain that, generally, the exercise of discretion and

independent judgment "involves the comparison and the evaluation of possible courses of

conduct, and acting or making a decision after the various possibilities have been considered."

29 C.F.R. § 541.202(a).  This phrase must be applied "in the light of all the facts involved in the

particular employment situation in which the question arises."  29 C.F.R. 541.202(b).  "The term

'matters of significance' refers to the level of importance or consequence of the work

performed."  29 C.F.R. § 541.202(a).  Factors such as "whether the employee carries out major

assignments in conducting the operations of the business" and "whether the employee performs

work that affects business operations to a substantial degree" may be considered in determining

whether an employee exercises the requisite discretion in matters of significance.  29 C.F.R. §

representative's work negotiating labor contracts involved "advising the bargaining unit on how
to conduct its business (in terms of hours, wages and working conditions)", and was
administrative in nature, whereas the bargaining unit members who worked in schools produced
a service.)

202(b).

Discretion may be exercised even when the decisions of an employee are subject to review.  29 C.F.R. 541.202(c); *West v. Anne Arundel County*, 137 F.3d 752, 764 (4th Cir. 1998) (explaining that the "fact that some recommendations made by [an employee] are subject to review by superior officers is no bar to application of the administrative exemption."). Moreover, DOL interpretive regulations make clear that the fact that more than one employee performs the same work of equivalent importance "does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.202(d).

With regard to human resources employees, the DOL has explained that human resources mangers who "formulate, interpret or implement employment policies . . . generally meet the duties requirements for the administrative exemption.  However, personnel clerks who 'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not".  29 C.F.R. § 541.203(e).  Furthermore, whether a recruiter exercises discretion and independent judgment within the meaning of the regulation depends "on the amount of selectivity exercised in matching persons seeking employment with the requirements of the job opening and in deciding which employee to send to any particular employer for consideration, as opposed to referring to the employer several prospects who generally meet the qualifications for the job."  Dep't of Labor Op. Ltr. 2005 WL 3308616; *accord* Dep't of Labor Op. Ltr. 2000 WL 34444341.

Although Ms. Kleinpeter did not have the power to make ultimate employment decisions for Aerotek's clients, the record shows that she exercised considerable discretion with regard to the selection of candidates to be sent to the client's hiring manager for approval.  The hiring of

employees certainly is work that affects business operations to a substantial degree.  As a

Recruiter and as an ARM, Ms. Kleinpeter did much more than simply screen applicants based on

minimum qualifications, or simply send the client several prospects who generally met the job

qualifications.  Rather, she developed her own recruiting strategies, compared contractors' skills

to the applicable job descriptions, interviewed candidates, and determined whether they were a

good fit based on her knowledge of the clients' personality.  *See* Dep't of Labor Op. Ltr. 2005

WL 3308616 (advising that staffing managers who did not "simply check off a few minimal

requirements, but [] evaluate[d] the potential worker's education, skills acquired in prior

employment, personality fit and ability to work within a particular organization", fell under the

administrative exemption).  She did not screen solely for minimum qualifications, but often sent

candidates to her Account Managers whose personalities made them a good fit, even when their

qualifications were not as impressive as others.  Additionally, Ms. Kleinpeter negotiated overall

pay, holiday pay and vacation pay.  She testified that holiday and vacation pay "were up to the

discretion of the recruiter".  (Kleinpeter Dep. at 207: 17-19).  The fact that she would consider a

particular range when negotiating pay does not mean she did not exercise discretion.  *See, e.g.,*

*Goff*, 424 F. Supp. 2d at 819 (staff supervisor who fell under the administrative exemption "had

discretion in setting employee bonus levels within a preset range.").

        Moreover, the fact that her supervisors reviewed her recommendations to the client does

not bar application of the administrative exemption, *see West*, 137 F.3d at 764, as it is clear from

the record that Ms. Kleinpeter was not subject to immediate direction or supervision.  Rather, she

sourced and interviewed candidates completely on her own, free from scrutiny.  The great

majority (seventy-five percent) of candidates recommended by Ms. Kleinpeter were sent to the

client.  Ms. Kleinpeter also testified that Mr. Parise rarely questioned the candidates she

14

recommended, and that Mr. Brannon only had a few questions here and there.  (Kleinpeter Dep. at 194: 14-22.)  Ms. Kleinpeter further used independent judgment by recommending to her Account Manager on some occasions that the client lower its expectations or increase its pay rates.  (*Id*. at 204: 4-7.)  Once a contractor was hired by a client company, Ms. Kleinpeter also used discretion as she managed the contract employees while on assignment, assessed and investigated contractor problems, and counseled and disciplined contractors.  There is no evidence that she did this under the direct scrutiny of a supervisor.

As the ARM for the Wachovia account, Ms. Kleinpeter continued to exercise discretion in her recruiting duties, but also used independent judgment as she began meeting regularly with the client and bringing in new business.  On her own, she was in charge of generating business for Aerotek in the risk management, operations, and back office operations lines of business of Wachovia.  Ms. Kleinpeter also spent a great deal of time mentoring junior recruiters, and she testified that she considered herself management at Aerotek.  (*See id*. at 369: 12-22.)  The record shows that Ms. Kleinpeter was not a low paid rank and file employee.  Rather, she exercised considerable discretion in placing with Aerotek's clients candidates whom she judged qualified, while also building business relationships for Aerotek.  Accordingly, as both a Recruiter and as an ARM she fell within the terms and spirit of the FLSA's administrative exemption.

## CONCLUSION

For the foregoing reasons, the court will grant the defendant's motion for summary judgment.  A separate Order follows.


March 30, 2010                                        /s/
Date                                        Catherine C. Blake
                                        United States District Judge